IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SENTRY PAINT TECHNOLOGIES,        :        CIVIL ACTION
INC.                              :
                                  :
          v.                      :
                                  :
TOPTH, INC.                       :        NO. 08-1064

MEMORANDUM AND ORDER

McLaughlin, J.                                October 31, 2008

        This is a breach of contract action over the sale of
land.  The plaintiff, Sentry Paint Technologies, Inc. ("Sentry
Paint") is the seller of the land.  The defendant, Topth, Inc.,
is the purchaser.  Topth refused to go through with the
contracted sale because of alleged environmental contamination.

        Topth based its refusal to complete the sale on its
interpretation of one clause of the contract, paragraph
10(e)(iv), which allows it to terminate the agreement if an
environmental investigation "indicates . . . the presence of
Contaminants" and if the cost to remediate same would exceed
$10,000.  Sentry Paint contends that Paragraph 10(e)(iv) was not
triggered because Topth had not (and has not) conducted a
sufficient investigation to adequately estimate remediation
costs.

        Sentry Paint's complaint brings five causes of action
against Topth:  for specific performance; breach of contract;

breach of the covenant of good faith and fair dealing; promissory estoppel; and contractually-based counsel fees.  Sentry Paint has withdrawn its claim for specific performance, and Topth has moved for summary judgment on the breach of contract claim and for the dismissal of all other claims.  For the reasons below, the Court will grant Topth's motion.[1]

I.   Summary Judgment Record

    A.   Initial Discussions About Sale of the Property

        In November 2007, a representative of Topth approached Sentry Paint, through its realtor, expressing interest in purchasing an industrial property owned by Sentry Paint at 237 Mill Street in Darby, Delaware County, Pennsylvania.

        As part of the initial discussions about the purchase, Sentry Paint's president provided Topth's representative with a copy of a Phase I Environmental Report dated December 22, 2004, and prepared by Samuel Kucia of Environmental Consultants, Inc. on behalf of Sentry Paint (the "Sentry Paint Phase I report").  This report found three existing recognized environmental conditions on the property:  1) soil and groundwater contamination from past improper delivery and storage of chemicals on the property; 2) four oil-filled transformers on the

---

[1]    The Court denied Sentry Paint's cross-motion for summary judgment in its prior Order of July 22, 2008.

property that might contain polychlorinated biphenyls (PCBs); and 3) existing storage of raw materials used in paint manufacture on the site.

On November 27, 2007, Topth and Sentry Paint executed a letter of intent for Topth to purchase the property for $640,000.[2]

B.   The Agreement of Sale

On or about January 8, 2008, the parties entered into an Agreement of Sale and Purchase for Topth to purchase the industrial property at 237 Mill Street in Darby, Pennsylvania. Agreement, attached as Ex. A to the Complaint.  The property consists of 3.1 acres of land and includes a 34,000 square foot building and a warehouse.  Compl. ¶¶ 6, 9, 12; Agreement ¶¶ 1, 1(a).

1.   Purchase Price and Deposit

The proposed purchase price under the agreement was $640,000.  The agreement acknowledged that Topth had paid an initial deposit of $10,000 upon the execution of the letter of intent, which was being held in escrow.  An additional deposit of

---

[2]     Certification of Benjamin Breskman, attached to Sentry Paint's Opposition to Summary Judgment ("Sentry Paint Opp."), at ¶¶ 5, 7, 11, 18; Phase I Environmental Site Assessment Report prepared by Environmental Consulting, Inc., attached as Exhibit B to the Affidavit of Samuel Kucia, attached to Sentry Paint Opp.

$54,000 was to have been paid after the conclusion of the inspection period provided under the agreement, with the balance paid at closing.  The closing date was to be February 1, 2008, but if not completed by that date, was to be extended to February 29, 2008, with that date being of the essence.  If the Buyer was unable to close title before that date, the seller was entitled to receive the deposit as compensation for damages.  Agreement ¶¶ 2(a), 2(b)(i)(A)-(B), 3(b)(i).

                2.   <u>Right to Environmental Inspection</u>

        The agreement contained a representation that, except for the conditions disclosed in the Sentry Paint's Phase I report, the property was in compliance or not reasonably likely to establish a potential liability under CERCLA or other environmental laws.  Agreement ¶ 10(a)(i).  The agreement also contained Sentry Paint's acknowledgment that Topth could conduct, at its sole cost and expense, an investigation into "compliance with Environmental Laws, the presence of Contaminants on, over, under, migrating from or affecting the Property  . . ."  This investigation was to be completed by February 1, 2008.  Agreement ¶ 10(e)(i).

                                    4

3    <u>Termination for Environmental Contamination</u>

The provision of the agreement at issue in this case, paragraph 10(e)(iv), allowed Topth to terminate the agreement if its environmental investigation indicated the presence of contaminants whose cost of remediation would exceed $10,000:

> If the environmental investigation indicates any non-compliance with any Environmental Law at or in connection with the Property or Personal Property or the use or operation thereof, or the presence of Contaminants on, under, over, migrating from or affecting the Property or the presence of any condition that may affect Buyer's intended use of the Property, and the cost to remediate same would exceed the sum of TEN THOUSAND DOLLARS ($10,000), then (A) the Seller would have the option to repair/remediate the non-complying condition at Seller's cost, or (B) offer the Buyer a price reduction, or (C) terminate this Agreement.  The Buyer must provide the Seller notice of its intent to seek recourse under the provisions of Paragraph 10(e)(iv) within three (3) business days of receiving notice of the non-complying condition.

Agreement ¶ 10(e)(iv).

4.    <u>Financing Contingency</u>

The agreement also contained a financing contingency, which stated that Topth would attempt to assume Sentry Paint's existing Small Business Administration ("SBA") loan related to the property.  The agreement provided that if Topth did not receive approval from the SBA to assume the loan on or before December 3, 2007, it could terminate the agreement, but if it did so, it would become responsible for the Seller's operating

5

expenses for the property and its structures from March 1 to May 31, 2008, unless the property sold to someone else before then. Agreement ¶ 13(c).

     5.   Choice of Law and Attorneys' Fees

The agreement is governed by Pennsylvania law. Agreement ¶ 19(c).  It also allows the prevailing party in any litigation arising from the agreement to recover "all costs incurred, including reasonable attorney's fees."  Agreement ¶ 19(m).

    C.   Topth's Failed Effort to Assume Sentry Paint's Loan

On January 3, 2008, the SBA approved Topth's assumption of Sentry Paint's zero-interest loan, but required Sentry Paint to continue to be bound by the loan agreement as a guarantor. Sentry Paint's counsel forwarded the SBA's approval to Topth on January 9, 2008, but said Sentry Paint was hesitant to agree to guarantee Topth's assumption of the loan unless Topth provided it with additional security.  No agreement to provide such security was ever reached and Topth did not assume the SBA loan.  Topth, however, did not exercise its right to terminate the Agreement under the financing contingency.[3]

---

[3]   January 3, 200[8], Letter from Sandra Lauriello of the SBA to Ayesha Hamilton, attached as Exhibit B to the Certification of Ayesha Hamilton ("Hamilton Cert.") submitted in

D.    <u>Topth's Environmental Inspection</u>

1.    <u>The Phase I Assessment by Mid-Atlantic Associates</u>

Prior to signing the agreement, on or about December 6, 2007, Topth commissioned the firm of Mid-Atlantic Associates to do a Phase I Environmental Site Assessment Report of the property (the "Topth Phase I report").  The report is dated January 27, 2008, but Topth says it received it on January 30, 2008.[4]  From the executive summary of the report (which is all that is in the summary judgment record), Mid-Atlantic Associates did an onsite inspection and a search of public records to prepare the report, but did not perform any soil or groundwater testing.

The report states that, based on a review of historical documents, the property had been used as an industrial work site for over one hundred years, first as a site for yarn manufacturing in the late nineteenth century, most recently as a storage and distribution center for paint materials and products from 1963 to 2003.  A review of files from the Pennsylvania Department of Environmental Protection ("PennDEP") showed past

_____

support of Sentry Paint Opp.; January 9, 2008 Email exchange between Ryan Harmon and Ayesha Hamilton, attached as Exhibit C to Hamilton Cert.; Hamilton Cert. ¶¶ 9-10.

[4]    The Executive Summary of the Phase I Report (hereinafter "the Phase I Report") is attached to the February 1, 2008, Letter from Ryan D. Harmon to Benjamin Breskman and Ayesha Hamilton, attached as Ex. B to Topth's Motion for Summary Judgment ("Topth Mot.").  Harmon states in his letter that the report was received by Topth on January 30, 2008.

violations relating to the storage, handling, and transportation of waste at the property.  The PennDEP file also contained a proposed consent order to remedy violations, drafted by PennDEP, but apparently never signed or agreed to by Sentry Paint.

Also included in the PennDEP file was a soil remediation plan (the "Dunn Plan"), dated February 5, 1987, and prepared for Sentry Paint by the firm of Dunn GeoScience Corp.  The Dunn Plan reported on an environmental investigation of the property completed in November of 1986.  This investigation included the taking of soil samples and the installation and sampling of six groundwater monitoring wells, focusing on an area of the property that had been used as a "solvent tank farm and resin fill area." The Dunn Plan states that soil and groundwater testing found concentrations of trichloroethelyne, benzene, ethylbenzene, toluene, and xylenes above statewide health standards.  The Plan presented Sentry Paint with remediation options for the contamination of the property's soil, including excavation and incineration, but did not address groundwater remediation.

The report says that the PennDEP file showed that PennDEP issued a letter to Sentry Paint stating that the Dunn Plan was deficient for its failure to address groundwater contamination, but that the file contained no other information about the clean up of contaminated soil or groundwater on the property.

8

The executive summary concludes with a fourteen-bulletpoint list of "potential recognized environmental conditions" on the property.  Among the potential conditions listed is the former site of six aboveground storage tanks removed in 2003 that had been used to store paint components. This is apparently the site of the "solvent tank farm" that was the focus of the Dunn Plan.  Also listed in the fourteen bulletpoints as potential environmental concerns are four oil-filled transformers, which testing shows contain levels of PCB below the EPA definition of a "PCB transformer."  The bulletpoints also cite as a potential concern the storage of raw materials for paint manufacturing, including resins, pigments, and solvents, in laboratories and warehouses on the property, with evidence of spills and leaks on the laboratory and warehouse floors.  The report also notes debris piles on the property, one containing a rusting drum, as well as mixing tanks on the property showing evidence of leaks.

The executive summary does not state whether the "potential recognized environmental conditions" found on the property will need to be remediated or whether further testing should be performed, nor does it contain any estimate of the cost of such remediation or testing.

2    Comparison of Topth's Phase I Assessment with the
Phase I Assessment prepared for Sentry Paint

The Phase I report prepared for Topth by Mid-Atlantic
Associates contains much of the same information as Sentry
Paint's Phase I report, provided to Topth before the signing of
the letter of intent.  Both reports describe the contents of the
PennDEP file concerning the property.  Both reports discuss the
prior PennDEP violations concerning the property, the unsigned
proposed consent order, and the 1987 Dunn Plan reporting the
existence of soil and groundwater contamination in the area of
the property used as a solvent tank farm.

All three of the "existing recognized environmental
conditions" found in the Sentry Paint report are also listed in
the fourteen bulletpoints of "potential recognized environmental
conditions" set out in the Topth report:  the four oil-filled
transformers, the raw materials stored on the site, and the
existing soil and groundwater contamination in the area of the
former tank farm.  The Topth report contains an additional ten
items of concern, including the existence of debris piles that
may have been used for waste disposal.

Neither the Topth nor the Sentry Paint report discuss
whether further remediation or testing should be done on the
property.  Neither give any estimate of the cost of remediation
or testing.

3    Communications between Topth and Mid-Atlantic
Concerning the Phase I Assessment and the Cost of
Future Remediation and Testing

After the Topth Phase I report was completed and
delivered to Topth, a conference call was held to discuss its
contents.  The participants on this call included Topth's
president, its environmental and corporate counsel, John Forsyth
of Mid-Atlantic Associates who authored the Phase I report, and
Marc Dugan, Topth's "point man" in negotiating the purchase of
the property.  Both Forsyth and Dugan have been deposed.  Their
testimony conflicts as to whether the call was held on January
30th or 31st of 2008, but the date of the call is not relevant to
this motion.[5]

Dugan testified that Forsyth told the conference call
participants that the report showed "serious problems" concerning
environmental contamination on the property and that Mid-Atlantic
Associates recommended a Phase II study be performed, which Dugan
understood to constitute further testing to determine what types
of contamination were present.  According to Dugan, Topth's
counsel questioned Forsyth about the cost of remediation of the
property, and Forsyth said that the cost of remediation could be

---

[5]    Deposition of Mark Dugan ("Dugan Dep.") at p. 27-28 and
Deposition of John V. Forsyth ("Forsyth Dep.") at p. 14, attached
respectively as Exhibit A and B to the Supplemental Certification
of Ayesha Hamilton in Further Opposition to the Defendant's
Motion for Summary Judgment ("Hamilton Supp. Cert."); Affidavit
of Mark Dugan, attached to Topth Mot. at ¶¶ 5-6.

anywhere from $60,000 to $600,000.  Dugan's deposition testimony
conflicted with a declaration he provided for Topth's motion in
which he stated that "Topth was told that the cost of remediating
the environmental issues at the property would be $150,000 to
$650,000."  On redirect examination, Dugan testified that
Forsyth's $60,000 to $600,000 figure may have included the cost
of a Phase II study, as well as the cost of remediation, but that
none of the ranges of costs discussed at the call ever had a low-
end estimate below $10,000.[6]

In his deposition, Forsyth stated that he told the
conference call participants that the Phase I study he performed
showed several areas of concern, including soil and groundwater
contamination.  Forsyth testified that he recommended that a
Phase II test be performed to determine the extent of the
contamination on the site.  When asked how much a Phase II
investigation would cost, he testified he told the conference
call participants it would be "thousands of dollars" and run
"into five figures."  He testified someone on the call asked him
what the remediation cost would be and he testified, to the best
of his recollection, that he told the group "it could range from
thousands of dollars to hundreds of thousands of dollars."
Forsyth testified that it was possible to give a cost estimate
for remediation, even without performing a Phase II study,

---

[6]     Dugan Dep. at pp. 25-26, 30, 34, 43, 46.

because remedial action plans had been proposed for the site in the Dunn Plan, and the cost of those proposed measures, including soil vapor extraction and excavation, could be estimated.  On redirect, he testified that the cost of implementing those remediation plans "would be thousands . . . well into five figures."[7]

       E.    Letters Between the Parties Concerning
            Plaintiff's Right to Terminate the Contract

In a letter dated February 1, 2008 (the last day of the inspection period under the contract), Topth's counsel, Ryan D. Harmon wrote to Sentry Paint's president, Benjamin Breskman and its counsel, Ayesha Hamilton, enclosing the executive summary of Topth's Phase I report.  Harmon stated that, given the report, "expanded investigation and remediation will need to be taken to bring the property into compliance with environmental law."  He proposed a Phase II study be conducted to determine the extent of the contamination, which he said could cost $25,000 to $60,000, and stated the costs of remediation "have been estimated to be anywhere from $150,000 to $650,000."[8]

Harmon's letter stated that, based on the costs of investigation and remediation, Topth was seeking recourse under

---

[7]    Forsyth Dep. at 24-25, 29-33, 38-39.

[8]    February 1, 2008, Letter from Ryan D. Harmon to Benjamin Breskman and Ayesha Hamilton, attached as Ex. B to Topth Mot.

paragraph 10(e)(iv) of the agreement, which by its terms, gave
Sentry Paint the option of remediating the contamination at its
cost, offering a price reduction, or terminating the agreement.
The letter stated that if Sentry Paint chose to remediate, Topth
would require satisfactory proof of complete remediation before
taking title and Sentry Paint would remain responsible for the
costs of the property during the remediation process.  If Sentry
Paint chose to reduce the price, Topth suggested a reduction of
$350,000, representing half the higher estimate for the cost of
remediation, plus indemnification if the remediation eventually
cost more than $350,000.  If Sentry Paint chose termination,
Topth requested the return of its deposit.  Topth also requested,
because the agreement required it to pay an additional deposit of
$54,000 three days after the termination period, that Sentry
Paint respond before then or extend the time for paying the
additional deposit.

On February 1, 2008, Sentry Paint's counsel, Ayesha
Hamilton, responded to Topth's letter by asking for a complete
copy of the Phase I report prepared by Mid-Atlantic and by
extending the deadline for Topth's additional deposit of $54,000
to February 11, 2008.[9]

On February 8, 2008, Hamilton wrote to Harmon, stating
that Sentry Paint would not pay for the cost of remediation or

---

[9]     February 1, 2008, Letter from Ayesha Hamilton to Ryan
D. Harmon, attached as Exhibit E to Hamilton Cert.

14

for the cost of a Phase II investigation "of the minor environmental condition existing on less than 1000 square yards of the property."  Hamilton stated that Sentry Paint would also not reduce the price of the property because the issues identified in Mid-Atlantic Associates' Phase I report were disclosed in Sentry Paint's own Phase I report, provided to Topth before the Letter of Intent was signed.  Hamilton stated that, under Paragraph 10(e)(4), "the only option remaining is to cancel the contract."  As an alternative, she proposed Topth consider a five-year lease on the property.[10]

Hamilton concluded by asking Topth to provide her by February 12, 2008, with either i) the required additional deposit of $54,000, if Sentry Paint was willing to go forward with the Agreement as signed; ii) written confirmation that Topth would agree to a five year lease; or iii) written intent to cancel the contract, at which time Sentry Paint would return the escrow upon written authorization.

---

[10]   Sentry Paint's president states in his certification in support of Sentry Paint's motion, that, to the extent that Hamilton's mention of an "option" to cancel in her letter could be construed as Sentry Paint's choosing to have the contract cancelled as permitted under the agreement, that Hamilton had no authorization to do so:  "Sentry did not authorize its counsel to cancel the contract and my plain reading of the language of the February 8, 2008, [letter] is that my attorney was asking the Buyer to disclose its intentions so that we might act accordingly."  Certification of Benjamin Breskman at ¶ 47, submitted with Sentry Paint Opp.

On February 12, 2008, Harmon wrote to Hamilton and told her that his client intended to terminate the Agreement.  He asked for the return of Topth's $10,000 deposit and reimbursement of a flood insurance payment of $3,909.[11]

On February 14, 2008, Hamilton wrote Harmon, stating that Topth had "failed to reasonably establish that the actual cost of remediating any alleged contamination on the property would in fact exceed $10,000" and so had failed to trigger the option to cancel under Paragraph 10(e)(iv).  Hamilton wrote that Topth could not establish that the cost of remediation would exceed $10,000 without a Phase II study, and because it did not conduct one under the time permitted in the Agreement, it had failed to conduct its due diligence within the contracted time and so must take the property "as is."[12]

Hamilton also complained in her letter about costs that Sentry Paint had incurred at Topth's request, including the cost of clearing the property, consolidating paint drums on the site, and terminating the leases of an existing tenant.  Hamilton also accused Topth of negotiating in bad faith.  Hamilton said her client would reimburse Topth for the cost of the insurance it purchased and would put Topth's deposit in escrow.

---

[11]   February 12, 2008, Letter of Ryan D. Harmon to Benjamin Breskman and Ayesha K. Hamilton, attached as Exhibit D to Topth Mot.

[12]   February 14, 2008, Letter from Ayesha Hamilton to Ryan D. Harmon, attached as Exhibit E to Topth Mot.

Also on February 14, 2008, Hamilton sent Harmon another letter, "in further response" to his letter of February 12.  This second letter stated that Hamilton "would like to clarify" that the terms of her letter of February 8 "do <u>not</u> constitute an offer of anything," but "are simply a reiteration of the contractual provisions contained in Paragraph 10(e)(iv)."  According to this second February 14 letter, the only offer contained in Hamilton's February 8 letter was an offer for Topth to lease the property.[13]

On February 15, 2008, Harmon responded by letter to Hamilton, disputing any accusation of bad faith and disputing in general terms her recitation of the facts.[14]

That same day, Sentry Paint filed the complaint in this matter in the Court of Common Pleas of Delaware County.

F.   <u>Expert Opinion of Samuel Kucia</u>

Sentry Paint has submitted the affidavit of Samuel Kucia of Environmental Consulting, Inc., in opposition to Topth's motion for summary judgment.  Kucia states that the Topth Phase I report adds "nothing new" to the information already disclosed in Sentry Paint's Phase I report, which he prepared.  He states that

---

[13]   February 14, 2008, Letter from Ayesha Hamilton to Ryan D. Harmon, attached as Exhibit G to Hamilton Cert. in support of Sentry Paint Opp.

[14]   February 15, 2008, Letter of Ryan D. Harmon to Benjamin Breskman and Ayesha K. Hamilton, attached as Exhibit F to Topth Mot.

17

neither of the two Phase I reports contains sufficient
information to allow an environmental consultant to render an
opinion as to the cost of remediation.  Only a Phase II report,
in his opinion, would provide sufficient information for a
consultant to render an opinion as to cost.[15]

Kucia states that, according to the standard practice
for environmental assessments, a Phase I report consists of a
document review, interviews with persons with knowledge of the
site, and a site inspection, but does not include any soil or
groundwater testing.  He states that standard practice is that a
Phase I report should be done no more than six months before the
date of acquisition of the property.  A Phase II report includes
environmental testing to determine the scope and nature of any
contamination.  He states that industry custom and practice would
be to perform a Phase II, if the previous Phase I indicated the
presence of contamination.[16]


II.  Proceedings Before this Court

The case was removed to this Court on March 3, 2008, on
the basis of diversity.  At the Rule 16 conference, both parties
stated that they did not need any discovery and wanted to submit
cross motions for summary judgment.  The Court set a schedule for

---

[15]     Affidavit of Samuel Kucia ("Kucia Aff."), attached to
Sentry Paint Opp. at ¶¶ 23-24, 35-38, 41.

[16]     Kucia Aff. at ¶¶ 27-29, 32-33.

the motions.  Both sides submitted affidavits with their summary
judgment motions.  The Court conducted oral argument on the
motions on June 20, 2008.  During oral argument, Sentry Paint
asked for permission to take certain depositions before the Court
decided the Topth's motion for summary judgment.  The Court
granted the request over Topth's objection.  After oral argument
the Court denied plaintiff Sentry Paint's motion for summary
judgment and received supplemental filings from both parties on
Topth's motion.

III.  <u>Analysis</u>

    A.  <u>The Breach of Contract Claim</u>

        Both parties agree that the resolution of Topth's
motion for summary judgment on the breach of contract claim turns
on the application of Paragraph 10(e)(iv) of the Agreement of
Sale.  Both parties also essentially agree on the meaning of that
paragraph, which says that if the conditions set out in Paragraph
10(e)(iv) are met, then the seller, Sentry Paint, has the option
of remediating environmental conditions on the property, reducing
the sale price, or terminating the agreement.  There is no
dispute that Sentry Paint was unwilling to remediate or reduce
the sale price, and that therefore, if the conditions in
Paragraph 10(e)(iv) were met, then the Agreement was properly
terminated and Topth cannot be liable for breaching it.

19

The parties' disagreement is whether the paragraph's conditions have been satisfied.  Topth contends it has sufficiently shown both the existence of contaminants on the property in non-compliance with environmental laws and that the cost of remediating those contaminants would exceed $10,000. Sentry Paint does not dispute that Topth has shown the presence of contaminants and the non-compliance with environmental laws, but argues that Topth cannot show that the cost of remediation would exceed $10,000.  Sentry Paint contends that Topth cannot show the cost of remediation without a Phase II study of the property, which Topth did not perform.  It also claims that Topth is using the environmental contamination on the site, of which it was fully aware from Sentry Paint's own Phase I report, to escape from the contract after it was unable to assume Sentry Paint's no-interest SBA loan.

The parties' Agreement of Sale provides that it is governed by Pennsylvania law, under which the interpretation of a contract is a question of law for the Court.  In re Old Summit Mfg., LLC, 523 F.3d 134, 136 (3d Cir. 2008) (citing Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped, 886 A.2d 706, 711 (Pa. Commw. Ct. 2005).  Under Pennsylvania law, a court is to interpret a contract so as to give effect to the parties' intent, and when a contract is clear and unequivocal, it must look only to the contract's language, taken as a whole, to determine that

intent:  "'Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed.'"  <u>Great Am. Ins. Co. v. Norwin Sch. Dist.</u>, __ F.3d. __, 2008 WL 4379058 (3d Cir. Sept. 29, 2008) (quoting <u>Murphy v. Duquesne Univ.</u>, 777 A.2d 418, 429-30 (Pa. 2001)).

Here, the parties agree that the language of paragraph 10(e)(iv) is clear and unequivocal.[17]  They also agree on its interpretation.  The paragraph gives Sentry Paint the option of conducting remediation, reducing the purchase price, or terminating the Agreement, if its conditions are met.  The relevant conditions are that "the [Buyer's] environmental investigation indicates [1] any non-compliance with any Environmental law at or in connection with the Property [or] . . . [2] the presence of Contaminants on, under, over, migrating from or affecting the Property . . . and [3] the cost to remediate same would exceed the sum of TEN THOUSAND DOLLARS."

Both parties agree that this language means that Topth must establish both that its environmental investigation reasonably indicated non-compliance with environmental laws or the presence of contaminants and that the environmental investigation reasonably indicated that the cost to remediate the contamination would exceed $10,000.  Neither party argues that

---

[17]   Topth's Memorandum in Support of its Motion for Summary Judgment ("Topth Mem.") at 6-8; Sentry Paint Opp. at 23.

Topth must establish that the actual cost of remediation will exceed $10,000.[18]

Having determined what paragraph 10(e)(iv) requires, the analysis turns to whether that requirement has been met.  A threshold question that neither party addressed in their briefing, but which the Court raised at oral argument, is who has the burden of proving that Topth complied with the requirements of paragraph 10(e)(iv).  The Court concludes that paragraph 10(e)(iv) is a condition subsequent, i.e., a condition that can

---

[18]    See Topth Mem. at 6-8; Sentry Paint Opp. at 23.  In its complaint, Sentry Paint appeared to take the position that Paragraph 10(e)(iv) required Topth "to show that there is actual contamination and to establish the actual cost of remediation." Compl. ¶ 66 (emphasis in the original).  In its briefing on the cross-motions for summary judgment and at oral argument, however, Sentry Paint has repeatedly stated that the paragraph requires only that Topth's investigation indicate the cost of remediation:

- "The contractual requirement was that the Buyer's 'environmental investigation indicate' the cost of remediation."  Sentry Paint Opp. at 26;

- "The parties' intent [as expressed in the Agreement and as evidenced by the earlier letter of intent] was to require the Buyer to provide a 'reasonable estimate' to show that the cost of remediation would exceed $10,000."  Sentry Paint Opp. at 28;

- "Sentry has never required Topth to establish the 'actual cost of remediation.'"  Sentry Paint's Reply to Topth's Opposition to its Cross-Motion at 2.

- "Well, I guess what I would suggest to the Court is quite simply that Topth could have done whatever they chose to do, as long as they indicated, established, showed, pointed to whatever, something more than a guess that their environmental investigation revealed that the cost exceeded [$]10,000."  Statement of Sentry Paint Counsel Ayesha Hamilton at Oral Argument, 6/20/08 Tr. at 8.

be invoked to terminate an existing obligation under a contract (as opposed to a condition precedent which is a condition necessary to the imposition of an obligation).  Under Pennsylvania law, the "existence of the condition subsequent which can be invoked as justifying the termination of a contract must be proved by the terminating party."  Massachussets Bonding & Ins. Co. v. Johnston & Harder, Inc., 16 A.2d 444, 448 (Pa. 1940).  Topth, therefore, has the burden of showing that the condition in paragraph 10(e)(iv) is met.

Sentry Paint does not dispute that Topth has shown the first element, the existence of environmental non-compliance or contaminants on the property.  Sentry Paint argues only that Topth has not adequately shown the second element, that its environmental investigation gives a reasonable basis for estimating the cost of remediation as greater than $10,000.

In its motion for summary judgment, Topth originally contended that it had shown the cost of remediation through an affidavit by its employee Mark Dugan.  His affidavit stated that, after Topth's consultant Mid-Atlantic Associates had provided Topth with a copy of the Phase I report, Topth "was advised" that the cost of remediation would be "significant," in the range of $150,000 to $650,000 and that the cost of a Phase II study to obtain a better cost estimate would be $25,000 to $60,000.

Dugan was subsequently deposed, as was Mid-Atlantic Associates employee John Forsyth, who had conducted the Topth Phase I study.  At deposition, Dugan gave testimony at variance with his affidavit, saying that at the January 30 or 31, 2008, conference call with Forsyth, Dugan, Topth's president, and Topth's counsel, Forsyth had said that the cost of remediation could cost anywhere from $60,000 to $600,000.  Forsyth, at his deposition, gave yet another figure for the estimated costs.  He testified that when asked the cost of remediation at the conference call, he said it could range "from thousands of dollars to hundreds of thousands of dollars," and that the cost of a Phase II study would cost "thousands of dollars," running into "five figures."  He testified that it was possible to estimate a cost for remediation, even without a Phase II study, because one could estimate the cost of the pre-existing remedial measures proposed in the 1987 Dunn Plan.  The cost of these measures, he testified, was "well into five figures."

Topth contends that the testimony of Dugan and Forsyth establishes that its environmental investigation reasonably indicated that the cost of remediating the contaminants on the property would exceed $10,000.  To oppose Topth's motion, Sentry Paint points to the inconsistencies between Dugan's affidavit and Dugan's testimony, which Sentry Paint argues creates an issue of fact that must be resolved by a jury.  Sentry Paint also relies

24

on the affidavit of its own expert Samuel Kucia, which states that, in his opinion, an environmental professional cannot provide a cost estimate from a Phase I study, and that the industry standard for a cost estimate requires a Phase II study.

The Court concludes that Topth has shown that the condition set out in paragraph 10(e)(iv) has been met.  In evaluating the conflicting evidence concerning what Topth was told at the January conference call, the Court cannot resolve issues of credibility.  Instead, on summary judgment, the Court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party.  Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 415 (3d Cir. 2008).  For purposes of deciding this motion, the Court must therefore accept as true the testimony that is most helpful to Sentry Paint.  See Rossi v. Standard Roofing, Inc., 156 F.3d 452, 476 n.14 (3d Cir. 1998) (holding, when confronted with a witnesses' self-contradictory deposition testimony, that "[t]his contradictory testimony leads to two possible conclusions, and on summary judgment, we must accept the one most favorable to [the non-movant]."). Here, the testimony most helpful to Sentry Paint is Forsyth's because he testified to a lower estimate of the remediation costs than Dugan did in either his affidavit or his deposition.

Forsyth testified that he told Topth's representatives that the cost of remediation could range "from thousands of dollars to hundreds of thousands of dollars" and that he could estimate that cost, even without a Phase II study, by using the cost of the pre-existing remediation measures proposed for the site in the Dunn Plan, which he estimated to be "well into five figures."  This testimony establishes that Topth's Phase I report reasonably indicated that the cost to remediate the property would exceed $10,000.

Sentry Paint argues that, because the lower end of the range for remediation costs given by Forsyth was "thousands" of dollars, Forsyth's testimony cannot establish that the cost will exceed $10,000.  This mischaracterizes what Topth is required to show to satisfy paragraph 10(e)(iv).  As Sentry Paint has conceded, Topth need not prove that the cost of remediation will exceed $10,000.  It must show only that its environmental investigation reasonably "indicates" that the cost of remediation will exceed that sum.  This is a very low threshold to meet. Even giving Sentry Paint the benefit of every reasonable inference from these facts, a range of potential remediation costs from several thousand to hundreds of thousands of dollars would give the party responsible for those costs a reasonable indication that the cost of remediation would exceed $10,000. This is particularly true given Forsyth's testimony that the cost

of the remedial measures proposed for the site in the Dunn Plan would exceed $10,000.

The opinion of Sentry Paint's expert, Samuel Kucia, that a Phase II study is necessary to properly estimate the cost of remediation does not create a genuine issue of material fact for trial or prevent summary judgment in Topth's favor.  Kucia does not address Forsythe's use of the pre-existing remediation plans in the Dunn report as a basis for his broad estimate of the remediation costs.  Kucia also does not say that Forsythe's estimation of the cost of remediation as thousands to hundreds of thousands of dollars is inaccurate.

Both sides agree that a Phase II study would better estimate the cost of remediation.  Forsyth testified that he recommended to Topth that one be performed to establish the parameters of any subsequent remedial measures.  A Phase II study, however, was not required to be conducted under the Agreement of Sale and was therefore not required to trigger the conditions in paragraph 10(e)(iv), if they were otherwise met.[19]

---

[19]    If a Phase II study were deemed to be an essential prerequisite to any remediation of the property, one could argue that the cost of the Phase II study itself must be considered part of the cost of remediation.  In light of Forsyth's uncontradicted testimony that the cost of a Phase II study would itself be "into five figures," if the Phase II were considered as a remediation cost, it alone would be over the $10,000 threshold of paragraph 10(e)(iv).  The Court need not determine whether the Phase II is properly considered part of the cost of remediation or part of the cost of investigation (for which Topth bears responsibility under the contract).  Even if the cost of the Phase II study is excluded from the cost of remediation, Topth

Sentry Paint's suggestion that Topth's Phase I report contained the same information as Sentry Paint's Phase I report prepared three years earlier, and that the contamination at issue was therefore already known to Topth when the Agreement was signed, does not affect whether Topth can trigger paragraph 10(e)(iv).  Sentry Paint concedes that the standard practice in the environmental consulting industry is that a Phase I must be performed within six months of an acquisition and that therefore Topth could not rely on Sentry Paint's pre-existing Phase I study, but had to perform its own.  That Topth would perform its own investigation was expressly provided for in the Agreement.

It is true that, from the information already disclosed in Sentry Paint's Phase I report, the parties could anticipate that Topth's Phase I would find contamination and, because the $10,000 trigger in paragraph 10(e)(iv) is a low threshold, they could also anticipate that the conditions in that paragraph were likely to be met.  The parties, however, negotiated the terms of paragraph 10(e)(iv) as part of an arms-length business transaction, and there is no allegation of fraudulent dealing or fraudulent inducement.  Both parties agreed to the condition subsequent set out in paragraph 10(e)(iv), and that condition having been met, Topth is entitled to either remediation at Sentry Paint's expense, a reduction in the purchase price, or

has shown that the condition in paragraph 10(e)(iv) is met.

termination.  Sentry Paint having chosen not to remediate the property itself or reduce the purchase price, Topth is entitled to termination of the contract and is not liable for its breach.

B     The Claims for Breach of the Covenant of Good Faith and
      Fair Dealing and for Promissory Estoppel

In addition to its claim for breach of contract, Sentry Paint also brings separate claims for breach of the implied covenant of good faith and fair dealing in the Agreement and for promissory estoppel.

The good faith and fair dealing claim is based on the allegation that, after Topth completed its Phase I report, it requested a $350,000 reduction in the purchase price to compensate it for what it claimed was the cost of remediating the contamination found in its report.  Sentry Paint contends that by seeking a price reduction for contamination that was already disclosed in Sentry Paint's own earlier Phase I report, Topth breached the covenant of good faith and fair dealing.  Compl. ¶¶ 104-117.

Sentry Paint's promissory estoppel claim is based on Topth's execution of both the letter of intent and the Agreement of Sale with knowledge of the contamination disclosed in Sentry Paint's Phase I report and Topth's statements that this contamination did not affect its willingness to go forward with the purchase.  Sentry Paint contends that these actions and

representations constitute a promise to purchase the property "as is" with respect to the contamination disclosed in its Phase I report.  Sentry Paint contends that, in reliance on this promise, it made several changes to the property at Topth's request which cost it over $10,000.  Compl. ¶¶ 119-140.

Topth has moved to dismiss these claims under Federal Rule of Civil Procedure 12(b)(6), contending that neither cause of action can be maintained when the parties have a valid, enforceable contract.  The Court agrees and will dismiss both claims.

Pennsylvania law recognizes an independent cause of action for breach of the duty of good faith and fair dealing only in "very limited circumstances," such as insureds' dealings with insurers and franchisees' dealings with franchisees.  Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000) (citing Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co., 560 A.2d 151, 153-53 (Pa. Super. Ct. 1989).  In Northview Motors, the United States Court of Appeals for the Third Circuit predicted that Pennsylvania courts would limit the application of claims for breach of the covenant to situations where they were "essential" and would not recognize an independent cause of action for breach of the covenant where the parties had entered into a detailed contract setting forth their obligations and rights.  Id.; see also McHale v. NuEnergy Group,

2002 WL 321797 at *8 (E.D. Pa. February 27, 2002) (finding that
"Pennsylvania law would not recognize a claim for breach of [the]
covenant of good faith and fair dealing as an independent cause
of action" where the allegations underlying the breach of
covenant claims are "essentially the same" as those underlying
the plaintiff's claim for breach of contract).

The Court similarly finds that Pennsylvania would not
recognize an independent claim for breach of the covenant of good
faith and fair dealing in this case.  As in Northview Motors, the
parties here entered into a detailed contract setting forth their
rights and obligations with respect to the purchase of the
property at issue.  The facts that Sentry Paint alleges give rise
to its claim for breach of the implied duty of good faith and
fair dealing are the same as those that form the basis for its
breach of contract claims.  Under these circumstances, Sentry
Paint's breach of covenant claims are subsumed in its breach of
contract claims and cannot be maintained as a separate cause of
action.[20]

_____

[20]    In support of its separate cause of action for breach
of the covenant of good faith and fair dealing, Sentry Paint
cites to the Pennsylvania Supreme Court's decision in Birth
Center v. St. Paul Co., 787 A.2d 376 (Pa. 2001) and the decision
of the Lawrence County Court of Common Pleas in Harlan v. Erie
Ins. Group, 2006 WL 1374502 (Lawrence Co. CCP February 16, 2006).
Both Birth Center and Harlan involved contractual bad faith
claims by an insured against an insurer, one of the "limited
circumstances" in which Pennsylvania recognizes an independent
cause of action for breach of the covenant of good faith and fair
dealing.  Neither case supports recognizing an independent cause
of action here in an action involving an arms-length purchase of

Sentry Paint's promissory estoppel claims must similarly be dismissed.  Under Pennsylvania law, the doctrine of promissory estoppel is applied to enforce a promise made in the absence of consideration.  It therefore does not apply when the alleged promise at issue is the subject of a binding contract. Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (upholding dismissal of promissory estoppel claims where the court found the parties had formed an enforceable contract); see also Domino's Pizza LLC v. Deak, 2007 WL 916896 (W.D. Pa. March 23, 2007) ("If courts permitted promissory estoppel claims based on representations made during the negotiations for integrated contracts, then there would be little point in enforcing" the parole evidence rule.).  Neither party disputes that their Agreement of Sale and Purchase constitutes a binding contract.  Sentry Paint accordingly cannot maintain a promissory estoppel claim based on Topth's alleged failure to perform actions encompassed by the Agreement.

C.  Counsel Fees

The Agreement of Sale and Purchase allows the prevailing party in any litigation arising from the agreement to recover "all costs incurred, including reasonable attorney's fees."  Agreement ¶ 19(m).  As part of their cross-motions, both

---

property.

parties moved for the award of counsel fees in the event they prevailed.  Having found that Topth is entitled to dismissal or summary judgment on all Sentry Paint's claims in this litigation, the Court will also enter summary judgment against Sentry Paint on its claims for an award of fees and costs under the contract. As the prevailing party in this litigation, Topth is entitled to the award of counsel fees under the contract.

In support of its request for counsel fees, Topth submitted the supplemental declaration of its counsel, Ryan D. Harmon, who avers that Topth has incurred litigation costs of $904.94 and attorneys' fees of $20,499.50.  The supplemental declaration states that the attorneys fees were billed for 12.2 hours of Harmon's time at $275.00 per hour; 38.4 hours of attorney David McComb's time at $380.00 per hour; and 0.7 hours of attorney Kenneth Fleisher's time at $400.00 per hour.  The supplemental declaration does not, however, provide an itemization of the costs incurred or the time expended by the attorneys.

Absent such a showing, the Court cannot determine whether the fees and costs sought by Topth have been reasonably expended, an issue on which Topth bears the burden of proof. See, e.g., Washington v. Phila. Cty. Ct. of Common Pleas, 89 F.3d 1031, 1035 (3d Cir. 1996) (discussing the award of attorneys fees to a prevailing party in a civil rights action).  The Court also

lacks any information about the qualifications of attorneys Harmon, McComb and Fleisher, and so cannot determine whether their hourly fees accord with the prevailing market rates in the community for attorneys of equivalent skill and experience.

The Court will therefore order Topth to provide an additional submission in support of its request for fees and costs, to provide the Court with this information, and provide Sentry Paint an opportunity to respond.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SENTRY PAINT TECHNOLOGIES,  :   CIVIL ACTION
INC.                         :
                             :
              v.             :
                             :
TOPTH, INC.                  :   NO. 08-1064

ORDER

AND NOW, this 31st day of October, 2008, upon
consideration of defendant's Motion to Dismiss the Complaint and
for Summary Judgment (Docket No. 3), plaintiff's opposition and
cross motion for summary judgment, defendant's opposition
thereto, and defendant's reply in support of its motion to
dismiss, and after a hearing held on June 20, 2008, IT IS HEREBY
ORDERED, for the reasons set forth in the accompanying memorandum
of law, that the Defendant's motion is GRANTED, as follows:

1.   Summary judgment is granted in favor of defendant
Topth, Inc. ("Topth") and against plaintiff Sentry Paint
Technologies, Inc. ("Sentry Paint") on Sentry Paint's claims for
breach of contract (Count Two) and for attorneys' fees and costs
under the Agreement of Sale and Purchase (Count Five).[21]

2.   Sentry Paint's claims for breach of the implied
covenant of good faith and fair dealing (Count Three) and for

---

[21]   Sentry Paint's claims for specific performance (Count
I) have previously been voluntarily dismissed.

promissory estoppel (Count Four) are dismissed for failure to state a claim.

3.   Topth is directed to file a supplemental submission in support of its request for fees and costs under the Agreement of Sale and Purchase on or before November 14, 2008. This submission shall address the deficiencies in its prior submission described in the memorandum of law accompanying this Order.  Sentry Paint may file a response to Topth's supplemental submission on November 21, 2008.


BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.


2